Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 31 2014, 8:45 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT C.L.:

**PAULA M. SAUER**
Danville, Indiana

ATTORNEY FOR APPELLANT H.L.:

**CARA SCHAEFER WIENEKE**
Wieneke Law Office, LLC
Plainfield, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**DAVID E. COREY**
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF )
THE PARENT-CHILD RELATIONSHIP OF: )
P.L. and D.L.  (Minor Children) and )
)
C.L. (Mother) and H.L. (Father), )
)
     Appellants-Respondents, )
)
           vs. )    No. 32A05-1405-JT-213
)
INDIANA DEPARTMENT OF CHILD )
SERVICES, )
)
     Appellee-Petitioner. )

APPEAL FROM THE HENDRICKS SUPERIOR COURT
The Honorable Mark A. Smith, Judge
Cause Nos. 32D04-1308-JT-5 and -6

**December 31, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

## Case Summary

C.L. ("Mother") and H.L. ("Father") each appeal the involuntary termination of their parental rights to their minor children, P.L. and D.L. We affirm.

## Facts and Procedural History

In its termination order, dated April 15, 2014, the trial court made eighty-six findings of fact, some of which follow:[1]

1.    P.L. was born on September 2, 2011, and is 2 years of age.

2.    D.L. was born on August 23, 2010[,] and is 3 years of age.

3.    Mother is the biological mother of P.L. and D.L.

4.    Father is the biological father of P.L. and D.L.

5.    Mother and Father have cohabitated since 2008 but have never married.

      …

9.    In September 2012, the family was living together at the Clover Motel in Plainfield, Indiana.

10.    DCS first became involved with Mother and Father when a reporter observed a bruise on D.L.'s forehead, heard yelling and screaming coming from inside the home, and the home was in disarray.

11.    DCS Family Case Manager, Tiffany Stewart, and Plainfield Detective Alyson Ritter, went to the [] home on September 19, 2012 in response to the DCS report.

---

[1] We note that the trial court refers to the parties by their full names. We use "Father," "Mother," and each child's initials where appropriate. We also note that, at times, the trial court uses "DCS" in reference to the Indiana Department of Child Services, "FCM" in reference to the family case manager, and "GAL" in reference to the guardian ad litem. We will do so as well.

12. Prior to going to the family's residence, Detective Ritter had reviewed a previous police report from March 2012 regarding a child welfare check and for drugs. One person had been arrested, but it was neither Father nor Mother.

13. On September 19, 2012, Mother would not allow DCS or Detective Ritter into the home. After waking Father, both parents came outside with the children. Father described D.L.'s injuries as occurring when she fell off a 3-wheel toy.

14. Stewar[t] observed a small, quarter-size bruise on D.L.'s forehead that appeared to be healing and not significant.

15. As FCM Stewart and Detective Ritter were talking with Father on September 19, 2012, they noticed he had several open sores from the top of his head to his feet which appeared to be consistent with persons who use methamphetamine. Father explained the sores were from MRSA and/or bed bugs that he had received from the hotel where they had previously stayed. He was agitated and frustrated.

….

16.[2] DCS obtained a court order for both parents to submit to drug screens and returned to the family's home on October 4, 2012. Both parents submitted to drug screens. Father's drug screen was positive for Amphetamine and Methamphetamine. Mother's screen was negative.

17. DCS along with Detective Ritter returned to the family's home on October 10, 2012 for a home visit. At that time, a new [FCM], Christina Monteleone, had been assigned.

18. Father was not present during the visit on October 10, 2012. Mother was home and submitted to another drug screen. Mother's drug screen was positive for amphetamine and methamphetamine.

19. Monteleone requested that the parents participate in a family team meeting to gather additional information before filing a CHINS petition. She also requested that Father submit to another drug screen on October 11, 2012. Father refused a second drug screen without a new court order.

---

[2] We have omitted four of the trial court's findings that we do not find relevant for background purposes. However, due to the trial court's misnumbering of its findings, we coincidentally resume again with number 16.

20. DCS filed a Verified CHINS Petition on October 18, 2012 alleging P.L. and D.L. to be [CHINS] and requested the Court to order the children immediately removed from the parents' care.

….

24. At the time of removal, the children were found in the care of a registered sex offender. Mother admitted that she used him as a babysitter on prior occasions. Mother acknowledged knowing the babysitter was a registered sex offender.

25. [FCM] Stewart and Detective Ritter removed the children from their parents pursuant to the Court order and placed them in the care of their maternal great-aunt and uncle, ….

26. At the time of removal, the children were observed to [be] dirty and not appropriately dressed for the weather.

….

28. On December 6, 2012, Mother admitted the children were [CHINS] based upon her admission that she had an untreated substance abuse addiction which affected her ability to parent her children.

29. Father was present in court on December 6, 2012 but left the courtroom prior to his case being called and did not return. The Court conducted a fact-finding hearing in Father's absence. The Court found that Father tested positive for amphetamine and methamphetamine on at least three separate drug screens and that the parents permitted a registered sex offender to babysit the children. The Court also found the parents homeless on the date of the fact-finding and staying with friends.

30. At the time of removal, Mother was open to completing services but Father was not.

31. Father threatened his attorney on December 19, 2012 and made threats against DCS and Mother's attorney.

32. Father's visitations with the children were ordered suspended on December 27, 2012, until he submitted to drug screens, to a mental health assessment and a substance abuse assessment and follow all recommendations of both.

4

33. Due to Mother's non-participation in services pending the dispositional hearing, her visits were also suspended until she submitted to drug screens, submitted to a substance abuse assessment and followed the recommendations and obtain individual and family counseling. The parents were also ordered to work toward obtaining housing and income to support themselves and the children.

34. The Court entered a Dispositional Order on January 3, 2013. The parents were ordered [to] do several things including the following: Contact the case manager; enroll in programs recommended by the DCS within a reasonable time; keep all appointments with any service provider, DCS or GAL; maintain suitable, safe and stable housing; secure and maintain a legal and stable source of income; not use, consume, manufacture, trade, distribute or sell any illegal controlled substances and will only take prescription medications for which a valid and current prescription exists; obey the law, complete a substance abuse assessment and follow all treatments and treatment recommendations; submit to random drug/alcohol screens; complete a mental health examination.

Mother's App. at 132-36.

The trial court made numerous additional findings regarding Mother's and Father's failure to participate and/or follow through with DCS services and recommended treatments, including substance abuse treatment programs and individual mental health assessments and therapy. From October 10, 2012, through June 27, 2013, Mother tested positive for illegal drugs including methamphetamine and THC on fifteen occasions. From October 4, 2012, through July 2, 2013, Father tested positive twenty times for illegal drugs and was arrested and convicted on drug-related charges. In July 2013, the court ordered the visitation of both parents with the children terminated and relieved DCS of having to provide further reunification services due to the parents' failure to abide by the court's dispositional orders, failure to participate in services, and their continued positive drug screens. The trial court

5

made additional findings that it was suspected that Mother had suffered domestic abuse at the hands of Father.

DCS filed petitions to terminate parental rights on August 20, 2013. As for the children, the trial court found that when initially removed from their parents in October 2012, the children were not clean and D.L. would not allow any male to change her diaper. D.L. was seen by a doctor and, due to a significant vaginal bacterial infection, the doctor reported "a non-specific" finding concerning possible molestation. *Id*. at 142. Since removal, the children have been thriving in the relative care of their maternal aunt and uncle, who are available and willing to adopt the children.

At the time of the termination hearing, Mother was unemployed and without transportation. Father was a self-employed floor installer but has remained without transportation since his vehicle was impounded by law enforcement. During the termination hearing, Mother admitted using drugs within the preceding three or four weeks. Father admitted that he would test positive for marijuana if tested during the hearing. The trial court found that Mother "nodded off" at least six different times during the termination hearing. *Id*. at 138.

Based upon the extensive findings of fact, the trial court concluded that: (1) there is a reasonable probability that the conditions that resulted in the removal of the children and their continued placement outside the home will not be remedied by either Mother or Father; (2) there is a reasonable probability that the continuation of the parent-child relationship between the children and both Mother and Father poses a threat to the well-being of the

6

children; (3) termination of the parent-child relationship between both parents and the children is in the best interests of the children; and (4) DCS has a satisfactory plan for the care and treatment of the children, which is adoption. Accordingly, the trial court determined that DCS had proven the allegations of the petition to terminate parental rights by clear and convincing evidence and therefore terminated Mother's and Father's parental rights. Both parents appeal. Additional facts will be provided as necessary.

**Discussion and Decision**

"The purpose of terminating parental rights is not to punish parents but to protect their children. Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted). Indeed, parental interests "must be subordinated to the child's interests" in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009).

Mother and Father filed separate briefs on appeal, raising some of the same and some different legal challenges. Mother and Father both assert that the trial court lacked subject matter jurisdiction to adjudicate the termination of parental rights. They also both assert that certain court-ordered drug testing violated their due process rights. Father points to additional alleged procedural irregularities of both the CHINS and termination proceedings that he asserts violated due process. Mother alone challenges the trial court's conclusion that termination of her parental rights is in the children's best interests. We will address these arguments in turn.

7

## Section 1 – Jurisdiction

At the outset, Mother and Father both challenge the Hendricks Superior Court's subject matter jurisdiction over the termination proceedings. "Subject matter jurisdiction is the power to hear and determine cases of the general class to which any particular proceeding belongs." *K.S. v. State*, 849 N.E.2d 538, 540 (Ind. 2006). "A tribunal receives subject matter jurisdiction over a class of cases only from the constitution or from statutes." *Georgetown Bd. of Zoning Appeals v. Keele*, 743 N.E.2d 301, 303 (Ind. Ct. App. 2001). When a court lacks subject matter jurisdiction, its actions are void ab initio and have no effect whatsoever. *Troxel v. Troxel*, 737 N.E.2d 745, 749 (Ind. 2000). "Subject matter jurisdiction is an issue of law to which we apply a de novo standard of review." *Lombardi v. Van Deusen*, 938 N.E.2d 219, 223 (Ind. Ct. App. 2010).

Indiana Code Sections 33-29-1-1.5 and 33-29-1.5-2 provide that all standard and nonstandard superior courts have original and concurrent jurisdiction in all civil cases and in all criminal cases. Similarly, Indiana Code Section 33-28-1-2 provides that all circuit courts have original and concurrent jurisdiction in all civil cases and in all criminal cases. Courts of such general jurisdiction are presumed to have subject matter jurisdiction. *Mishler v. County of Elkhart*, 544 N.E.2d 149, 151 (Ind. 1989). Regarding the filing of a petition to terminate parental rights specifically, Indiana Code Section 31-35-2-3 provides that the "probate court has concurrent original jurisdiction with the juvenile court in proceedings on a petition to terminate the parent-child relationship" involving a child in need of services. Our statutory law further provides that a "petition to terminate the parent-child relationship" involving a

8

child in need of services "may be signed and filed with the juvenile or probate court …." Ind. Code § 31-35-2-4.

As Hendricks County has neither a statutorily created separate probate court nor a juvenile court, subject matter jurisdiction for termination of parental rights cases remains vested concurrently in the county's circuit and superior courts pursuant to statute.[3] Thus, as far as statutorily conferred subject matter jurisdiction is concerned, the Hendricks Superior Court certainly had jurisdiction over cases of the general class, that class being civil proceedings, to which these termination of parental rights cases belong.

Mother and Father maintain that Hendricks County Local Court Rules mandate that all termination of parental rights cases be filed in the Hendricks Circuit Court. *See* LR32-AR1-1 (2013) (providing that all cases with a designation of JT "shall be filed in the Hendricks Circuit Court.").[4] We acknowledge that although a trial court must follow its own local rules, upon failure to do so, the court's subsequent action is not void; rather, it is voidable. *See Buckalew v. Buckalew*, 754 N.E.2d 896, 898 (Ind. 2001). Indeed, our supreme court recently considered the interplay between statutorily conferred subject matter jurisdiction and local

---

[3] We note that various chapters of Indiana Code Article 33-33 (for Hendricks County, Indiana Code Chapter 33-33-32) contain further provisions unique to each county's court system that should be harmonized, if possible, with the general provisions. *See Sanders v. State*, 466 N.E.2d 424, 428 (Ind. 1984) (statutes should be construed together so as to produce a harmonious statutory scheme; only if "the two statutes present an irreconcilable conflict" will the "more detailed statute … prevail over the less detailed"). Formerly, Indiana Code Section 33-33-32-8 provided that "[e]ach Hendricks superior court has original and concurrent jurisdiction with the Hendricks circuit court in all civil actions and proceedings" but that "none of the Hendricks superior courts have the jurisdiction of a juvenile court." That section was repealed by Public Law 201-2011, Section 115, and it appears that the Hendricks County statutes currently contain no jurisdictional parameters regarding its circuit and superior courts that would override the general provisions applicable to all counties.

[4] The current version of this rule can be found at LR32-AR1-3.

9

court divisions and case allocation rules. *See In re J.T.D.*, No. 45S03-1406-AD-387, 2014 WL 6843629 (Ind. Dec. 4, 2014). In summary, the court explained that "[l]ocal rules cannot confer, revoke, or override subject matter jurisdiction, but they may properly prescribe venue—the particular location among courts that have jurisdiction for cases to be heard." *Id.* at *1. Indeed, "'venue statutes and rules do not confer jurisdiction but rather prescribe the location at which trial proceedings are to occur from among the courts empowered to exercise jurisdiction.'" *Id.* at *5 (quoting *Benham v. State*, 637 N.E.2d 133, 136-37 (Ind. 1994)). Consequently, a judgment terminating parental rights entered by a court with improper venue would not be void, but merely voidable. *See id*. at *6.

Therefore, although we agree with Mother and Father that Hendricks Superior Court was not the proper venue for the termination of parental rights pursuant to local court rules, as with other trial court errors, such error is available upon appeal only if a specific and timely objection was made. *See Buckalew*, 754 N.E.2d at 898. Here, neither Mother nor Father objected to venue in Hendricks Superior Court nor filed a motion to transfer the termination proceedings. Therefore, any claim of improper venue is waived and the parties may not now attack the court's termination order on that basis.

10

**Section 2 – Due Process**

Next, both Mother and Father point to certain alleged procedural irregularities during the CHINS and termination proceedings which they claim violated their due process rights.[5] The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits state action that deprives a person of life, liberty, or property without a fair proceeding. *In re B.J.,* 879 N.E.2d 7, 16 (Ind. Ct. App. 2008), *trans. denied.* Accordingly, the State must satisfy the requirements of the Due Process Clause when it seeks to terminate the parent-child relationship. *S.L. v. Indiana Dep't of Child Servs.*, 997 N.E.2d 1114, 1120 (Ind. Ct. App. 2013). "Due process in parental-rights cases involves the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing government interest supporting the use of the challenged procedure." *Id.* "Ultimately, the resulting balance of those factors must provide 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *In re G.P.*, 4 N.E.3d 1158, 1166 (Ind. 2014) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

Our supreme court recently explained that CHINS, termination, and adoption

---

[5] Specifically, Mother and Father both challenge the trial court's grant, without first holding a hearing, of DCS's motion to control conduct compelling the parents to submit to drug screens as part of the initial DCS investigation. Father alleges four additional "procedural errors" which he claims constituted due process violations including: (1) DCS failed to give him a copy of the case plan; (2) he was unrepresented by counsel for some of the CHINS proceeding because his court-appointed counsel withdrew due to threats made by Father and Father opted to proceed pro se for a period of time before the court appointed another counsel for him; (3) the GAL remained involved in the case even though she had a conflict of interest with him due to threats that he made against her; and (4) the termination factfinding hearing was not completed within the statutory timeframe.

proceedings "line up somewhat like dominoes; although one proceeding may not necessarily tip over onto the next, neither can it usually fall without being pushed by the proceeding before it." *See id.* Accordingly, any procedural irregularities in a CHINS proceeding may be of such significance that they deprive a parent of procedural due process with respect to the termination of his or her parental rights. *Id.* Nevertheless, it is well settled that a parent may waive a due process claim in a CHINS or termination proceeding by raising that claim for the first time on appeal. *McBride v. Monroe Cnty. Office of Family & Children*, 997 N.E.2d 1114, 1120 (Ind. 2013).

Both parents concede that they did not object to any of the alleged procedural irregularities or otherwise bring their due process claims to the attention of the trial court during either the CHINS or termination proceeding and that they raise these issues for the first time on appeal. They each attempt to avoid waiver of their claims by asserting that the alleged due process violations constitute fundamental error.[6] However, both Mother and Father failed to allege fundamental error in their principal appellate briefs and instead raise the issue for the first time in their reply briefs. Parties may not raise an issue, such as fundamental error, for the first time in a reply brief. *Curtis v. State*, 948 N.E.2d 1143, 1148 (Ind. 2011). Accordingly, they have waived our consideration of the issue. *See id.*

_____

[6] Although we have applied the doctrine of fundamental error only in limited situations in civil cases, termination of parental rights is one such situation. *See S.M. v. Elkhart Cnty. Office of Family & Children*, 706 N.E.2d 596, 599 n.3 (Ind. Ct. App. 1999).

## Section 3 – Best Interests

Mother alone challenges the trial court's conclusion that termination of her parental rights is in P.L. and D.L.'s best interests. Indiana Code Section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following relevant requirements:

(2) The petition must allege:

(A) that one (1) of the following is true:

    (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

    (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

    (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

    (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove "each and every element" by clear and convincing evidence. *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). [7]

We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which "leaves us with a definite and firm conviction that a mistake has been made." *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied.*

In determining the best interests of a child, the trial court must look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). "In so doing, the trial court must subordinate the interests of the parent to those of the child." *Id.* The court court need not wait until a child is harmed irreversibly before terminating the parent-child relationship. *Id.* We have previously held that the

---

[7] Father does not challenge the trial court's conclusion that termination of his parental rights is in the children's best interests, so we will not address that conclusion as it pertains to Father. Likewise, as neither parent specifically challenges the trial court's conclusions or the sufficiency of the evidence regarding the other statutory factors required for termination, we do not address those factors.

recommendations of the case manager and court-appointed advocate, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to establish by clear and convincing evidence that termination is in the child's best interests. *Id.*

Here, FCM supervisor Jessica Klatte testified that she believed that termination of Mother's parental rights is in both P.L. and D.L.'s best interests.[8] Klatte noted that Mother failed to complete and/or make any progress regarding many of the DCS service referrals and recommended treatments. Klatte further noted that Mother consistently tested positive for drugs throughout the pendency of the proceedings.[9] Indeed, during the termination hearing, Mother admitted that she had used methamphetamine within the preceding thirty days. Tr. at 272, 281. Klatte opined that Mother could not provide a safe and stable home environment for the children due to her failure to address her admitted substance abuse issues.

Similarly, GAL Suzanne Conger opined that termination of Mother's parental rights was in P.L. and D.L.'s best interests. Conger specifically noted Mother's lack of progress and unwillingness to complete DCS services, her continued drug abuse, and her repeated failures to demonstrate that she could provide a safe and stable home for her children. Conger explained that Mother has insisted on staying in a relationship with Father and that his drug addiction and control over Mother continues to have a negative effect on Mother's

---

[8] The record indicates that, in addition to serving as the FCM at the time of the termination proceeding, Klatte supervised the previous four FCMs in this case, and therefore she had substantial "knowledge about the case throughout the life of this case." Tr. at 369.

[9] Mother tested positive for amphetamine, methamphetamine, and TCH, or a combination thereof, on fifteen occasions. Some of these positive results were obtained when Mother was visiting with the children. Mother missed a total of fourteen additional drug screens, each of which is considered a positive result.

ability to change her conduct and to adequately parent the children. Conger opined that "the children and this family have been involved with DCS for quite some time" and that despite ample opportunities, Mother has "continued on a downward [spiral]" preventing her from being able to "provide the stability that the children need." *Id.* at 413.

Mother does not challenge the validity of these opinions but simply maintains that "[d]espite poverty, few resources, a limited support system and drug dependency, [she] was a loving and attentive parent." Mother's Br. at 28. Still, the trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 152 (Ind. 2005). DCS is not required to rule out all possibilities of change; rather, it need only establish "that there is a reasonable probability that the parent's behavior will not change." *In re Kay L.*. 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). This record is replete with evidence of Mother's habitual patterns of poor decisionmaking as evidenced by her continued drug use and relationship with Father. Although Mother points to evidence which she asserts is favorable to her, her argument is merely an invitation for us to reweigh the evidence, which we cannot do. *See D.B.*, 942 N.E.2d at 871. In light of the testimony of FCM Klatte and GAL Conger, coupled with Mother's habitual patterns of conduct indicating that there is a reasonable probability that the conditions that led to the children's removal will

not be remedied, we cannot say that the trial court's conclusion that termination of Mother's parental rights is in P.L. and D.L.'s best interests is clearly erroneous.[10]

## Conclusion

The Hendricks Superior Court had subject matter jurisdiction to adjudicate the termination of parental rights, and its judgment is not void. Mother and Father have waived any claim that the Hendricks Superior Court was not the proper venue. Similarly, both parents' claims of fundamental error based upon alleged due process violations that occurred during the CHINS and termination proceedings are waived. The trial court's conclusion that termination of Mother's parental rights is the best interest of the children is supported by clear and convincing evidence and is not clearly erroneous. Therefore, we affirm the trial court's order terminating both Mother's and Father's parental rights to P.L. and D.L.

Affirmed.

FRIEDLANDER, J., and KIRSCH, J., concur.

---

[10] We note that Mother appears to challenge only one of the trial court's individual findings of fact as not supported by the evidence. Specifically, Mother challenges finding number 29 in which the trial court described the parents at the time of the CHINS adjudication as "homeless" and "staying with friends." Mother's App. at 135. Mother argues that she and Father always provided adequate shelter for the children that did not equate to homelessness. First, we find the trial court's description factually accurate, as the record is undisputed that Mother and Father were without a permanent home at the time of the CHINS factfinding hearing. However, even were we to set aside that finding as erroneous, the numerous unchallenged findings that remain are clearly sufficient to support the trial court's judgment terminating Mother's parental rights, and specifically the trial court's conclusion that termination is in the children's best interests. Accordingly, Mother has not demonstrated grounds for reversal. *See In re B.J.*, 879 N.E.2d 7, 20 (Ind. Ct. App. 2008) (erroneous finding is merely harmless surplusage when additional findings, supported by the evidence in the record, provide sufficient basis for trial court's ultimate conclusion), *trans. denied.*

17